# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION


**MEIRA E. SHAPIRO,**

     **Plaintiff,**

**vs.**                                          **CASE NO. 4:06cv351-MP/WCS**

**MICHAEL J. ASTRUE,[1]**
**Commissioner of Social Security,**

     **Defendant.**

_____/


## REPORT AND RECOMMENDATION

     This is a social security case referred to me for a report and recommendation

pursuant to 28 U.S.C. § 636(b) and local rule 72.2(D).  It is recommended that the

decision of the Commissioner be reversed and the case be remanded to gather

additional evidence.

**Procedural status of the case**

     Plaintiff, Meira E. Shapiro, applied for disability insurance benefits and

supplemental security income benefits.  Plaintiff was 21 years old at the time of the

_____

[1] Michael J. Astrue became Commissioner of Social Security on February 12, 2007,
and is automatically substituted as Defendant.  FED. R. CIV. P. 25(d).

alleged onset of disability (June 24, 2003), had a GED education, and had past relevant work as a restaurant hostess, sales clerk, cashier, desk clerk, fast food worker, and stock clerk.  Plaintiff alleges disability due to bipolar affective disorder, psychotic disorder, anxiety disorder, and attention-deficit hyperactivity disorder.  The Administrative Law Judge found that Plaintiff was able to do her past relevant work and was not disabled as defined by Social Security law.  Plaintiff contends that she has a disability that is equal to or equivalent to Listing 12.04 (now Listing 112.04).

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)(citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of

evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.   Is the individual currently engaged in substantial gainful activity?

2.   Does the individual have any severe impairments?

3.   Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.   Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence in the record**

**Plaintiff's testimony**

Plaintiff was 23 years old at the time of her administrative hearing.  R. 433.  She

was living with her parents, who provided all of her support.  *Id.*  She said she helped

with cooking and cleaning.  *Id.*  She had a driver's license, and was able to drive herself

to doctor's appointments.  *Id.*

Plaintiff attended Tallahassee Community College for about four years and

earned about 30 credits.  R. 435.  Each class was about 3 credits each, so she

completed 10 classes, that is, about one year of college credit for the four she attended.

*Id.*

Plaintiff said she worked as a stock clerk initially for about 30 hours a week, but

she "started throwing up," and eventually, when she quit that job, she was working only

about 5 hours a week.  R. 436-437.  She said that she typically kept a job about three

months and then would be fired or she would quit.  R. 437.  She had never worked full

time at a job for more than a month or two.  R. 438.

Plaintiff said that she began treatment for depression when she was in middle

school.  R. 439.  She said that in sixth grade, she would not eat, and by ninth or tenth

grade, she was on medication.  *Id.*  She said that currently, she is depressed and

spends most of her time in bed.  R. 440.  She said that when she was fifteen, she had

crying and "hyper" spells.  *Id.*  She said her current medication makes her exhausted.

R. 441.

Plaintiff said she had panic attacks and she takes medicine to prevent severe

anxiety.  R. 441.  She said her last panic attack was when she "got in my wreck."  *Id.*

The motor vehicle accident was on May 2, 2005, and the hearing was on August 3,

2005.  R. 431 and 441.  She said that before the accident, she had panic attacks about

every other month.  R. 442.

Plaintiff said that she was unable to sleep regularly.  R. 442.  She said that she

either sleeps too much or cannot sleep for days.  *Id.*

Plaintiff said that she had frequent thoughts of hurting herself.  R. 444.  She said

that her medications made her nauseous and she had migraine headaches.  R. 445.

She said she had trouble concentrating, remembering, and sitting still.  R. 446.  She had

trouble sitting still in classes at Tallahassee Community College.  R. 447.  She had

someone taking notes for her in those classes.  *Id.*  She said that when she tried to take

notes, she could not listen to the teacher and write at the same time.  *Id.*

Plaintiff said that she had difficulty controlling her anger.  R. 447.  She said she got mad "a lot" with family and friends.  R. 448.  She said that once a month, during her period, she would "like, lose it," for three or four days.  R. 450.  She said "I get my manic phases and then my depressed phases and then I get, like, really mad and yell at people and stuff a lot.  Then I have to take extra medicine to [sic], that time of the month."  *Id.*  She said she took about 20 pills each day.  R. 451.

The ALJ asked Plaintiff why she could not return to work at Publix Supermarket, and she said that she was taking Depakote[2] and kept getting sick and throwing up.  R. 453.  She said that although Depakote was discontinued, she had side effects "a lot" from other medications and was "exhausted."  R. 454.  Plaintiff said that the pills helped, and she especially needed sleeping pills to go to sleep.  R. 455.

**Medical evidence**

In October, 1997, at 16 years of age, Plaintiff was admitted to the psychiatric center at Tallahassee Memorial Hospital.  R. 167.  It was reported that she was experiencing bizarre behavior secondary to mood swings.  *Id.*  She had reduced concentration, sleep, and appetite, had racing thoughts, pressured speech, and was alternating between being hyperactive and depressed.  *Id.*  She was taking Zoloft but had increased the dosage on her own, which correlated with worsened mood swings.  *Id.*  She abused drugs (Ritalin, "acid," opium, ketamine, ecstasy, codeine) and alcohol, and experienced impulsive behavior.  *Id.*

---

[2] Depakote is used for manic episodes associated with bipolar disorder, epilepsy, and migraine headaches.  PHYSICIANS' DESK REFERENCE (2005).

Plaintiff was also taking medication for asthma, allergies, and stomach pains.  R. 168.  She was a good student in tenth grade, but because of her mood swings, she was falling behind.  *Id.*  She had been previously tested and found to have dysthemic disorder and oppositional defiant disorder.  *Id.*

Upon examination, Plaintiff was observed to be hyperverbal and displayed manic-like behavior.  R. 168.  She expressed some suicidal thoughts but was not actively suicidal.  *Id.*  It was noted that she had very poor insight, and was pleased with her alcohol and drug abuse.  *Id.*  She liked to feel high.  *Id.*  She was not opposed to being in the hospital, but her insight into the need was poor.  R. 169.  The attending psychologist, Sue O'Kelley, Ph.D., thought that Plaintiff "was struggling with early bipolar disorder."  *Id.*  Depakote was started.  *Id.*  A few weeks later, Connie L. Speer, M.D., wrote that she and Dr. O'Kelley thought that Plaintiff needed "long term placement."  R. 171.

In January, 1999, Plaintiff had a psychological evaluation by Casey Schmidt, Ph.D.  R. 177.  Dr. Schmidt noted the 1997 hospitalization and Dr. Speer's diagnosis of bipolar affective disorder.  R. 178.  Plaintiff was then taking four medications.  It was reported that

> her medication regime has eliminated the thought disturbance and mood
> has improved as well.  However, she continues to have problems
> sustaining attention to tasks and inhibiting impulsive behaviors.

R. 178.  Plaintiff's school history to that date (she was then enrolled in 11th grade) was recounted, and it was noted that her "potential for disruptive, defiant, and affective lability has continued to place her at risk for academic failure and continued problems relating to family members and peers."  R. 179.  Testing revealed that Plaintiff's

receptive language capabilities were in the average range, and her visual-motor integration capabilities were in the lower limit of the low average range.  R. 180.  Dr. Schmidt said that the data strongly suggested that Plaintiff suffered from attention deficit hyperactive disorder as well as bipolar affective disorder.  R. 181.  Dr. Schmidt thought that medication alone would be ineffective in fully addressing Plaintiff's difficulties, and said that the medication should be monitored to avoid adverse side-effects.  R. 182.

On October 24, 2000, Plaintiff admitted herself to the Tallahassee Memorial Behavioral Health Center.  R. 190.  She was drunk and threatened to kill herself.  *Id.* She said she had not been sleeping for two days.  *Id.*  It was noted that Plaintiff had been taking Neurontin,[3] Celexa,[4] Klonopin,[5] Adderall[6] (the latter of which, according to her boyfriend, she was selling on the street), and Ambien[7] for the last three years.  *Id.* The following was Plaintiff's mental status examination:

> Patient is currently very manicy, loud, uncooperative, cursing everybody at staff and previous doctors she has been to.  She doesn't have any insight at all.  She feels she does not need to be here, is loud.  Her affect is inappropriate, mood is labile.  She is oriented X.

---

[3] Neurontin is indicated for management of postherpetic neuralgia and as an adjunctive therapy in the treatment of partial seizures.  PHYSICIANS' DESK REFERENCE (2005).

[4] Celexa is a serotonin reuptake inhibitor used for depression.  PHYSICIANS' DESK REFERENCE (2004), p. 1292-1293.

[5] Klonopin is a brand name for Clonazepam, an anticonvulsant prescribed for control of petit mal and other seizures.

[6] Adderall, a form of amphetamine, is used with children with attention deficit disorder with hyperactivity.  PHYSICIANS' DESK REFERENCE (2005).

[7] Ambien is indicated for short term insominia.  PHYSICIANS' DESK REFERENCE (2005).

R. 191.  Plaintiff's primary diagnosis was bipolar affective disorder, with secondary diagnoses of oppositional disorder, attention deficit disorder of childhood with hyperactivity, nondependent alcohol abuse, antisocial personality, and histrionic personality disorder.  R. 197.  On discharge a day later, Plaintiff had calmed down and was much more compliant.  R. 198.  It was said that she understood the negative effects of alcohol upon her condition.  *Id.*  She was assigned a Global Assessment of Functioning score of 60 on Axis V.[8]  R. 199.

Fourteen months later, on December 5, 2001, Plaintiff was seen on an emergency basis by Dr. Thu Thai, having been brought in by a police officer.  R. 256. Dr. Thai reported:

> The psychiatric evaluation on admission revealed that the patient is well known to this physician.  She has been treated for bipolar disorder type two and attention deficit for many years by this physician and other psychiatrists in Tallahassee.  She was fairly stable on medication until about two weeks ago.  Yesterday her father called this M.D. to report that she cut her forearms.  Today she talked about death and suicide at TCC [Tallahassee Community College] and was committed.  The mental status examination revealed that the patient denied suicidal thoughts.  She said she was only depressed and she cut her arm only to relieve anxiety and frustration.  Her mother and her boyfriend agreed that she is not dangerous to herself at this time.

R. 256.  She was discharged with a GAF score of 55.  Dr. Thai said:

> The patient is alert and oriented to time, place and person.  Mood is good and affect is appropriate.  Speech is coherent with normal tone, speed and volume.  Thought process is logical and goal directed.  Patient denies any A/V hallucinations, delusions, suicidal and homicidal ideations.  No side effects of medication are seen or reported.

---

[8] Axis V of the DSM-IV Multiaxial System is explained at: http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

*Id.*  Plaintiff was taking Klonopin, Neurontin, Soma,[9] Zoloft,[10] and Trazodone.[11]   *Id.*

On July 25, 2002, Margaret L. Hardee, Coordinator, Disability Support Services at Tallahassee Community College (TCC), prepared a memorandum setting forth Plaintiff's experience as a student at TCC from December, 1999, through July, 2002.  R. 272.  Ms. Hardee had established a procedure allowing Plaintiff to come to her office when she had difficulties in class, with the hope that "one of our counselors in our office [would] assist her in becoming and remaining calm."  *Id.*  She stated that in the fall semester, Plaintiff had troubles with two of her instructors, but "was not dismissed from school."  *Id.*  On December 5, 2001, she was removed from school and transported to the Apalachee Mental Health facility by the campus police because she threatened suicide.  *Id.*  That hospitalization is set forth in the paragraph immediately above.

Ms. Hardee states that in the spring of 2002, Plaintiff seemed to be stable, and she "did well," earning a 3.76 grade point average.  *Id.*  On May 6, 2002, when Plaintiff returned for the summer session, Plaintiff complained of depression and the experience of "manic cycles."  *Id.*  She was very nervous, and said she was having a "difficult time."  *Id.*  Ms. Hardee wrote:

---

[9] Soma is prescribed as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions.  PHYSICIANS' DESK REFERENCE (2004), p. 1919.

[10] Zoloft is prescribed to treat major depressive disorder, obsessive-compulsive disorder, panic disorder, posttraumatic stress disorder, premenstrual dysphoric disorder, and social anxiety disorder.  PHYSICIANS' DESK REFERENCE (2004), pp. 2891-2892.

[11] *Trazodone* hydrochloride, sold as Desyrel, is an antidepressant.  PHYSICIANS' DESK REFERENCE (2002), p. 518.  It is not later editions.

> As classes started Meira was unable to stop talking in class and she was upset the majority of the time that I was in contact with her. She was constantly warned about constantly interrupting the instructor and about making comments that were not on topic or were inappropriate in the classroom. Although she tried she was unable to control her behavior when she went back to the classroom and she was dismissed from school for the Summer A term. She was allowed to return for B term.

*Id.* Ms. Hardee concluded that Plaintiff was an intelligent young woman, and said she had grown fond of her. R. 273.

Attached to Ms. Hardee's memorandum are letters from instructors, detailing the kinds of behaviors that resulted in her dismissal from school, all of which occurred in May, 2002. For example, one instructor writes that in May, 2002, during a class, Plaintiff made a comment each time the instructor made a statement. R. 276. She said that although the comments were not hostile, the comments disrupted the class. *Id.* She said that Plaintiff's comments became "increasingly impulsive, inappropriate, and off the subject of the discussion." *Id.* A second instructor related that she had scheduled a make-up examination for Plaintiff for 5:00 p.m., that Plaintiff had been seen nearby at that time, but Plaintiff did not arrive until 5:30 p.m. R. 277. When the instructor told her she was not happy with her tardiness, Plaintiff "became hysterical and started to insult" the instructor, threatening to have the instructor fired. *Id.*

On September 30, 2002, Plaintiff attempted suicide after her boyfriend terminated their relationship. R. 298. She was admitted for an overnight hospital stay. *Id.* She expressed regret the next day, acknowledging that she did not want to die. R. 299. She was then working as a stocker for Publix. *Id.* It was noted that she had been admitted for mental health treatment at PATH in December, 2001. *Id.* The mental examination determined that Plaintiff was cooperative, without tangential or fragmented

thinking, and without hallucinations, delusions, or suicidal ideation.  R. 300.  She was

alert, oriented in time and place, her memory was intact, she was able to do

calculations, she had a good fund of knowledge, and her insight was good.  *Id.*  The

diagnosis was "status post overdose and bipolar disorder by history; now stabilized."  *Id.*

The physician, Dr. Munasifi, assigned a GAF score of 60, with highest (apparently

estimated on days preceding the suicide attempt) of 70-80.  R. 301.

On March 7, 2003, Plaintiff was seen by P. C. Debelius-Enemark, M.D.  R. 370-

376.  Dr. Debelius set forth an extensive and detailed history of Plaintiff's problems to

that date.  R. 370-371.  Dr. Debelius said that Plaintiff was fidgety that day, and her

affect was labile.  R. 373.  She jumped from topic to topic without a clear connection

between issues.  *Id.*  She had difficulty processing complex information or long

sentences.  *Id.*  He felt she was competent from a clinical standpoint, however.  *Id.*  Dr.

Debelius said:

> Overall, it appears that the patient presents with disturbance of her
> thought process with problems in concentration and processing
> information.  She also reports auditory and visual hallucinations on
> occasion, particularly when her condition is exacerbated.  She reports a
> disturbed emotional and affective content associated with some of these
> abnormal perceptions.  The patient has modified her behavior accordingly
> and it appears that the underlying picture may be compatible with
> psychotic disorder.  Her current chart diagnosis include ADD, anxiety
> disorder, and bipolar disorder.

R. 374.  Dr. Debelius's diagnosis was psychotic disorder, NOS.  *Id.*  He assigned a

current GAF of 63, and a GAF of 70 for the past year.  *Id.*  He began a trial of Abilify.[12]

*Id.*  He asked her to return in about seven weeks.  R. 375.

---

[12] Abilify is indicated for the treatment of schizophrenia.  PHYSICIANS' DESK
REFERENCE (2005).

On June 24, 2003, shortly after Dr. Debelius began his treatment, Plaintiff was examined on a consultative basis by Marie P. Hume, Ph.D.  R. 330.  Plaintiff reported that she had dropped out of Tallahassee Community College by this time because she was failing in all of her classes, which she attributed to her illness.  *Id.*  Plaintiff was then taking Depakote, Effexor,[13] Klonopin, Adderall, and Zyprexa.[14]  *Id.*  Plaintiff had been under the care of Dr. Abebe, but had been recently changed to Dr. Debelius.  *Id.*

Plaintiff reported having significant problems with sleep, and that when she was able to fall asleep, she slept for a long time.  *Id.*  She said that the medications made her feel bad, made her feel tired, and she was still depressed.  R. 330-331.  She said she did not want to do anything but stay in bed, that she was nauseous at work, and she was told at work that she was not dependable.  R. 331.  She was then a stock clerk at Publix Supermarket, but only working five hours a week.  *Id.*  She had worked there about two years.  *Id.*  Plaintiff said she had not felt good for about two years.  *Id.*  She said that she last felt manic in her freshman year in high school, but had not felt like that since then.  *Id.*  She reported that she heard voices, and suffered panic attacks.  *Id.*  She said it was hard to concentrate on work.  *Id.*

Plaintiff denied having any significant relationships in her life.  R. 331.  She said that she thought that everyone at work hated her, and she did not like crowds.  *Id.*  She preferred to stay at home and rent a movie.  *Id.*  Dr. Hume wrote:

---

[13] Effexor is prescribed for depression.  PHYSICIANS' DESK REFERENCE (2004), p. 3413.

[14] Zyprexa is a psychotropic agent used for the treatment of schizophrenia and as a short-term treatment for manic episodes associated with Bipolar I disorder.  PHYSICIANS' DESK REFERENCE (2004), pp. 1857-1858.

> Ms. Shapiro reports that on a regular day she will lay [sic] in bed and watch television.  She eats once or twice a day.  Her parents prepare meals.  She does very little for herself with the exception of her personal care.  She lived by herself one time for three months in her own apartment.  She reports she got "real depressed and ended up in the psych ward."

*Id.*

Dr. Hume noted that Plaintiff's appearance was neat, she was polite and cooperative, and she seemed fully alert and aware.  R. 332.  Her speech was "spontaneous[,] logical and coherent."  *Id.*  Her mood was depressed, however, and her range of emotional expression was flat.  *Id.*  She was not anxious or suicidal.  *Id.*  Her thought processes were clear and organized.  *Id.*  The content of her thoughts was noteworthy for depressive themes, and she was "rather whiney."  *Id.*  Dr. Hume said: "Generally she seems like a nice young person but no doubt she alienates others by her constant whining and negative mood."  *Id.*  She was not psychotic.  *Id.*  "Her insight into her psychiatric problems was poor.  She views herself as helpless."  *Id.*  Dr. Hume's diagnosis on Axis I was bipolar disorder, on Axis II was features associated with borderline personality disorder, and her prognosis was "guarded."  *Id.*

Plaintiff was seen again at the hospital on September 5, 2004, having experienced a "severe panic attack."  R. 424.  She was given two extra Clonazepam,[15] and it was noted that she had no suicidal ideation.  *Id.*

---

[15] The brand name of Clonazepam is Klonopin.  It is prescribed for seizures and panic attacks.  PHYSICIANS' DESK REFERENCE (2005).

On about May 2, 2005, Plaintiff was in a motor vehicle accident and had a panic attack as a result.  R. 410.  She arrived at the emergency room crying and screaming, demanding to be given Ativan.[16]  R. 409.  She said she hurt all over.  R. 408.

On May 9, 2005, Plaintiff returned to the emergency room suffering from panic and anxiety lasting two hours.  R. 400.  Plaintiff had used alcohol that night.  *Id.*  She was diagnosed with lumbar strain and anxiety, and discharged in a stable condition to her home.  R. 398.  She then went to outpatient services in a state of agitation, stating she was thinking of harming herself.  R. 391.  Plaintiff displayed pressured speech and was easily agitated and excitable.  *Id.*  Urinalysis detected the presence of cannabinoids, cocaine, and benzodiazepines.  *Id.*  She said she had used these controlled substances to alleviate distress.  *Id.*  Dr. Debelius-Enemark said that Plaintiff's GAF score on discharge and for the past year was 75.  R. 392.

Plaintiff was examined by Kirk J. Mauro, M.D., of Medical Rehabilitation Specialists II, Inc., on June 13, 2005, on referral from Thomas G. Serio, M.D., for evaluation and treatment following the motor vehicle accident on May 2, 2005.  R. 352.  She had been in a small motor vehicle (a Mazda Miata) when a large motor vehicle (a Hummer) backed into her vehicle.  *Id.*  She suffered a panic attack, consisting of severe shortness of breath, screaming, nausea, and vomiting.  *Id.*  She was treated at the emergency room with Skelaxin.[17]  She was then treated by Dr. Serio for cervical,

---

[16] Ativan, which is lorazepam, is benzodiazepine with an antianxiety, sedative, and and anticonvulsant effects.  PHYSICIANS' DESK REFERENCE (2003).

[17] Skelaxin is prescribed "as an adjunct to rest, physical therapy, and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions."  PHYSICIANS' DESK REFERENCE (2004), p. 2181.

shoulder, thoracic, and lumbar pain.  *Id.*  She reported to Dr. Mauro that her physical

pain was 7 on a scale of 10.  *Id.*  She reported difficulty bending, lifting, or carrying, and

an inability to help her parents with cooking, cleaning, or laundry.  *Id.*  She could feed,

groom, dress, and bath herself.  *Id.*  She could sit for greater than one hour.  *Id.*  Dr.

Mauro's physical examination was basically negative for injury, with some findings of

pain upon movement.  R. 353.  He reported she was "very tangential, consistent with

her ADHD.  It is very difficult to get her to answer questions in a concise manner."  *Id.*

Dr. Debelius's treatment notes cover the period from April 9, 2003, through June

27, 2005, the same period discussed above.  R. 356-368.  The notes are very difficult to

read, but there are entries in 2003 on April 9, May 2, June 16, July 15, August 1, August

10, September 12, October 16; in 2004, January 12, February 10, May 13, June 30,

July 25, July 30, September 2, September 7, November 11; and in 2005, January 6,

February 15, March 11, April 18, May 28, and June 27.  *Id.*  In all, Dr. Debelius entered

treatment notes on 23 occasions, not counting the initial examination.  *Id.*

Some of Dr. Debelius's findings can be discerned by use of a magnifying glass,

but about half of what he wrote is illegible.  On May 2, 2003, Plaintiff reported she had

had a difficult week and could not make it to some finals at TCC.  R. 368.  She had

experienced increased hallucinations, and could not drive.  *Id.*

On June 16, 2003, Plaintiff called, reporting that she had felt tired that day.  *Id.*

She had been up late.  *Id.*  She had not had hallucinations.  *Id.*

On October 16, 2003, Dr. Debelius wrote that since March 3, 2003, Plaintiff's

mood had been stable and her anxiety was controlled.  R. 365.  This finding is at odds

with the findings on May 2 and June 16 noted above, however.  On February 14, 2004,

Plaintiff again had to withdraw from her classes.  R. 363.  She had been unable to

sleep.  *Id.*  She also reported some panic attacks and hallucinations.  Id.  On May 13,

2004, Plaintiff said she was "better" and was "happy all the time," and her headaches

were better.  R. 362.  On July, 25, 2004, Plaintiff was "fidgety" and "talkative."  R. 361.

She said she got nauseated if she forgot her medications, and was "always tired."  *Id.*

She had had a recurrence of a migraine headache; Depakote was discussed and the

level increased.  *Id.*

On September 2, 2004, Plaintiff reported that she was doing well, and her activity

level was OK.  R. 360.  On September 7, 2004, Plaintiff returned with her father.  *Id.*

She had visited the emergency room of the hospital with a panic attack.  *Id.*  She was

worried that she would have another attack.  *Id.*  Her anxiety, she thought, was related

to stress and her medications were adjusted.  *Id.*

On November 11, 2004, Plaintiff said she was doing well again.  R. 359.  She

was staying at home with her parents.  *Id.*  She was also doing well on January 6, 2005,

and she had had a good holiday.  *Id.*  On that date she was thinking about moving to

Tampa, Florida.  *Id.*  On February 15, 2005, Plaintiff reported that she had been

nauseated and tired.  R. 358.  She said she would stay home and not do anything.  *Id.*

On July 27, 2005, Dr. Debelius expressed his opinion that Plaintiff's condition met

the criteria of Listing 12.04.  R. 355.  He based this opinion upon his "[r]eview of clinical

records and outpatient followup."  *Id.*

**Legal analysis**

**Whether the Administrative Law Judge properly discounted the
opinion of the treating physician**

Plaintiff contends that the ALJ did not give sufficient weight to the opinion of Dr. Debelius that Plaintiff's disability met the criteria of Listing 12.04.  Plaintiff contends that the reasons given were not sufficient.  Doc. 17, p. 13.  Plaintiff contends that the reasons given for discounting the opinion "are indicators that he [the ALJ] did not believe Dr. Debelius' opinion was based on 'medically acceptable clinical and laboratory diagnostic techniques,' " and thus, pursuant to the regulation, the ALJ was required to contact Dr. Debelius for clarification.  *Id.*

Analysis of these contentions is governed by well-established law concerning opinions from treating medical sources and the burden of proof to prove disability at step three.  The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence.  Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992).  This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004).  The ALJ must clearly articulate the reasons for rejecting the treating physician's opinion.  *Id.*

> The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error. . . .  Where the Secretary has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true.

MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

Where there is an ambiguity in the treating physician's records or opinion, the

Administrative Law Judge should take steps to clarify it:

> Additionally, if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e).

Newton v. Apfel, 209 F.3d 448, 453 (5th Cir. 2000).  The Commissioner's regulations

provide that if "the evidence we receive from your treating physician . . . is inadequate

for us to determine whether you are disabled,"

> [w]e will first recontact your treating physician . . . to determine whether the additional information we need is readily available.  *We will seek additional evidence or clarification from your medical source when the report from our medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.*  We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source.  In every instance where medical evidence is obtained over the telephone, the telephone report will be sent to the source for review, signature and return.

20 C.F.R. § 404.1512(e)(1) (emphasis added).  *See also*, Rosa v. Callahan, 168 F.3d

72, 79 (2d Cir. 1999) ("One of our recent opinions confirms, moreover, that an ALJ

cannot reject a treating physician's diagnosis without first attempting to fill any clear

gaps in the administrative record) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir.

1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek

additional information from [the treating physician] sua sponte.")).

The Commissioner's rules provide that if the claimant has an impairment that is listed in or equal to an impairment listed in Appendix 1, Subpart P, following 20 C.F.R. § 1599, then a finding of disability will be made at step three without considering the claimant's age, education, and work experience.  20 C.F.R. § 1520(d).  "The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard.  The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.' "  <u>Sullivan v. Zebley</u>, 493 U.S. 521, 532, 110 S.Ct. 885, 892, 107 L.Ed.2d 967 (1990) (emphasis by the Court).  A claimant is entitled to benefits if it is shown that his or her limitations meet, or are medically or functionally equal to, the limitations set forth in the Listing.  <u>Shinn ex rel. Shin v. Commissioner</u>, 319 F.3d 1276, 1282 (11th Cir. 2004).

The claimant has the burden of proving that her impairments meet or equal a listed impairment by presentation of specific evidence of medical signs, symptoms, or laboratory test results meeting all of the specified medical criteria.  <u>Sullivan v. Zebley</u>, 493 U.S. at 530, 110 S.Ct. at 891.  "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Id.* (emphasis by the Court).

> When a claimant contends that he has an impairment meeting the listed impairments, the burden is on the claimant to present specific medical findings that meet the various tests listed under the description of the applicable impairment, or, if in the alternative, he contends that he has an impairment which is equal to one of the listed impairments, the claimant must present evidence which describes how the impairment has such an

equivalency.  *Bell v. Bowen*, 796 F.2d 1350, 1353 (11th Cir.1986)
(Appendix A).

Wilkinson on behalf of Wilkinson v. Bowen, 847 F.2d 660, 662 (11th Cir. 1987).

However, even though a claimant's own description of symptoms is not medical

evidence, a description of symptoms is relevant evidence to a determination of whether

a claimant's impairment meets or equals a listed impairment and should be considered

along with evidence from medical sources.  Shinn ex rel. Shin v. Commissioner, 319

F.3d at 1285 (finding the statement above from Wilkinson on behalf of Wilkinson,

requiring "specific medical findings," to be *dicta*).

Listing 12.04[18] provides the following criteria for affective disorders:

12.04 *Affective Disorders*: Characterized by a disturbance of mood,
accompanied by a full or partial manic or depressive syndrome. Mood
refers to a prolonged emotion that colors the whole psychic life; it
generally involves either depression or elation.

The required level of severity for these disorders is met when the
requirements in both A and B are satisfied, or when the requirements in C
are satisfied.

A. Medically documented persistence, either continuous or intermittent, of
one of the following:

1. Depressive syndrome characterized by at least four of the
following:

a. Anhedonia or pervasive loss of interest in
almost all activities; or

b. Appetite disturbance with change in weight;
or

c. Sleep disturbance; or

---

[18] Available at: http://www.ssa.gov/OP_Home/cfr20/404/404-ap10.htm.

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

i. Hallucinations, delusions, or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or

b. Pressure of speech; or

c. Flight of ideas; or

d. Inflated self-esteem; or

e. Decreased need for sleep; or

f. Easy distractability; or

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

h. Hallucinations, delusions or paranoid thinking;

or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

In rejecting the opinion of Dr. Debelius, the ALJ wrote:

While Dr. Debelius treated the claimant for her bipolar disorder, his own office records do not support a conclusion that the claimant's impairment meets section 12.04 of the Listing of Impairments. They do not show the required symptoms and functional limitations of the frequency and severity as provided under the "A," "B," or "C" criteria of the Mental Listings. Rather, they indicate the claimant's condition was stable as long as she remained compliant with her treatment regimen. Dr. Debelius repeatedly noted that the claimant was "doing well." She reported daily activities that indicated she was active and functional, such as her work activity and social activities. Dr. Debelius also reported Global Assessment of

Functioning levels, a 63 and 75, consistent with only mild to moderate impairment.

R. 28.  There does not appear to be anything in this passage finding a "conflict or ambiguity that must be resolved," or finding that "the report does not contain all the necessary information," or finding that the opinion was not "based on medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1512(e)(1). The ALJ did not find ambiguity in the records, or a lack of information, or fault the diagnostic techniques of Dr. Debelius at all.  He simply found that the clinical findings made by Dr. Debelius during his course of treating Plaintiff did not correlate with the criteria of Listing 12.04.

The evidence to support the reasons given for discounting the opinion of Dr. Debelius is mixed.  The GAF scores in this record range between 55 to 80, a range that suggests only moderate to mild disability:

> The GAF scale reports a "clinician's assessment of the individual's overall level of functioning."  *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994).  A GAF score of 60 reflects moderate symptoms or "moderate difficulty in social, occupational, or school functioning." *Id.* at 32.  A GAF score of 61-70 reflects mild symptoms or "some difficulty" in those areas, but the individual "generally function[s] pretty well."

Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).  This is some substantial evidence in the record to discount Dr. Debelius's opinion that Plaintiff's condition met Listing 12.04.

The treatment records of Dr. Debelius, on the other hand, to the extent that they can be read, do not show that Plaintiff was doing well as long as she was compliant with her medication as found by the ALJ.  Indeed, the record lacks substantial evidence for a

finding of significant noncompliance with medications.  There do not seem to be any clear instances of failure to take medication as the cause of not doing well.  While Dr. Debelius found that Plaintiff was doing well on a number of occasions, he also found that she was not doing well on a number of occasions.  That she was not doing well on a number of occasions is corroborated by the several emergency hospital admissions and the documented difficulties while attending Tallahassee Community College.  In summary, the treatment notes of Dr. Debelius, when combined with all of the other evidence of record, are not inconsistent with his opinion.

Were Dr. Debelius's treatment notes more legible, the court might have more confidence in the ALJ's rejection of Dr. Debelius's opinion.  The evidence, however, is too mixed to merit that recommendation.  The strongest point, the GAF scores, is seriously undercut by much of the other evidence.  Dr. Debelius had two years of treatment experience with Plaintiff at the time he rendered his opinion.  His opinion must not be lightly discounted, particularly when the treatment notes are so illegible and the ALJ did not point to significant places in the treatment notes that were inconsistent with the opinion.

It is recognized that Administrative Law Judges have many cases, and it is difficult for an ALJ with so many other cases to delay this case even further to gather more evidence, but that approach is recommended here.  Plaintiff is a young woman who might have potential to succeed if encouraged to try.  She should not be awarded disability benefits without a firm record basis.  On the other hand, she should not be denied benefits without a firm record basis.  A remand for further evidence from Dr. Debelius and from Plaintiff's current treating physician is recommended.

**Whether the ALJ's determination of Plaintiff's residual functional capacity is supported by substantial evidence in the record**

The ALJ found that Plaintiff has no exertional limitations, and only moderate limitation of ability to maintain work persistence and pace, and he found that she would not be expected to be absent from work more than two times a month.  R. 29-30.  He found that she "remains capable of following instructions and relating to others in a work environment."  R. 29.  With that residual functional capacity, he found that Plaintiff could perform all of her past relevant work as a restaurant hostess, sales clerk, cashier, fast food worker, and stock clerk.  R. 30.  At issue is whether Plaintiff's mental impairment imposes greater limitations.

Plaintiff has had a well-documented mental illness starting in her early teen years.  By the time of the administrative hearing, she had experienced a number of instances of panic attacks, auditory hallucinations, suicidal ideation, and inability to control impulsive behaviors in class.  She had been unable to hold a job for longer than a few months, worked only a few hours a week, and had been dismissed once from college due to inability to refrain from inappropriate comments.  There is evidence that she had significant adverse side effects from her numerous medications.  It is difficult to see how the ALJ could have concluded that Plaintiff remains capable of following instructions and relating to others in a work environment.  The central issue, however, is the opinion of the treating physician, Dr. Debelius.  Since remand is needed to clarify his opinion, Dr. Debelius or Plaintiff's current treating mental health physician should be asked to express an opinion as to her ability to relate appropriately to others in the work place, to follow instructions, remain focused, and to persist in a task.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to

deny Plaintiff's application for Social Security benefits be **REVERSED** and the claim be

**REMANDED** for additional evidence from Dr. Debelius or from Plaintiff's current treating

mental health physician.

**IN CHAMBERS** at Tallahassee, Florida, on April 10, 2007.


s/     William C. Sherrill, Jr.
WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**